# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JFE STEEL CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 08-633-LPS |
| | : | |
| ICI AMERICAS, INC, | : | |
| IMPERIAL CHEMICAL INDUSTRIES | : | |
| LIMITED | : | |
| | : | |
| Defendants. | : | |

## **OPINION**

Edward M. McNally, Jody C. Barillare, MORRIS JAMES, Wilmington, DE; Kenneth C. Moore, Stacy D. Ballin, Mark J. Savage, Daniel C. Mazanec, SQUIRE, SANDERS & DEMPSEY, L.L.P., Cleveland, OH, Attorneys for Plaintiff.

Michael P. Kelly, Andrew S. Dupre, Matthew J. Rifino, MCCARTER & ENGLISH, LLP, Wilmington, DE; Michael L. Hardy, Heidi B. Goldstein, Joshua A. Klarfeld, THOMPSON HINE LLP, Cleveland, OH, Attorneys for Defendants.

June 22, 2011
Wilmington, Delaware

**Stark, U.S. District Judge:**

# I. INTRODUCTION

This case arises out of a dispute between, on the one hand, Plaintiffs JFE Steel Corporation ("JFE") and SABIC Innovative Plastics US, LLC ("SABIC" and, together with JFE, "Plaintiffs") and, on the other hand, Defendants ICI Americas, Inc. and Imperial Chemical Industries PLC (together, "ICIA" or "Defendants"). All parties ask the Court to grant summary judgment, at least in part, in their favor. A total of three motions are presently pending before the Court: (1) Plaintiffs' motion for partial summary judgment on its CERCLA claims (Counts I-V) (D.I. 139); (2) Plaintiffs' motion for partial summary judgment on its contract claims (Counts VI-VIII) (D.I. 142); and (3) Defendants' interim motion for summary judgment on all of Plaintiffs' claims (D.I. 140). For the reasons that follow, the Court will deny Plaintiffs' motion for summary judgment on the CERCLA claims; grant Plaintiffs' motion for summary judgment on the breach of contract claims; and grant in part and deny in part Defendants' motion for summary judgment on all claims.

# II. FACTUAL BACKGROUND

## A. Contamination at the Santa Ana Site

From 1984 to 1991, ICIA owned a parcel of land in Santa Ana, California ("the Santa Ana site" or "site") on which it operated a Specialty Compounds Business. ICIA primarily used the Santa Ana site for its Specialty Compounds Business, but also used a portion of it for recycling polytetraflouroethylene, commonly known as "Teflon." (D.I. 141 at 3; D.I. 145 at A509) Part of ICIA's Teflon recycling process involved the use of perchloric acid. As part of that process, ICIA boiled scrap Teflon in an "acid mixture" and then rinsed the Teflon with

1

water. (D.I. 145 at A477) The excess water, which was tainted with the perchloric acid, flowed from the containers in which the Teflon was rinsed into a concrete drainage swale and then onto a nearby grassy area. Eventually, the contaminated water drained into the gutter and sewage system and, ultimately, into the groundwater at the Santa Ana site. (D.I. 144 at A141.2) ICIA concedes that it owned the Santa Ana site, that it operated a Teflon recycling operation during its ownership, and that the site is now contaminated. (Tr. at 5; *see also* D.I. 80 at 3)

In 1991, ICIA sold the Santa Ana site and the Specialty Compounds business to Kawasaki Steel Plastics ("KSP"), a subsidiary of Kawasaki Steel Corporation ("KSC").[1] (D.I. 144 at A1) The transaction between KSP and ICIA was accomplished through execution of an Asset Purchase Agreement ("APA") and a Framework Agreement, both dated October 3, 1991. (D.I. 146 Ex. B & C)[2] While the APA covered the land, buildings, and machinery of the Specialty Compounds business, the APA did not contemplate a sale of the Teflon recycling operation. (D.I. 145 at A510) Instead, a distinct "PTFE Reprocessing Transitional Services Agreement" ("TSA") provided that ICIA would continue to clean Teflon with acid at the Santa Ana site for a period of time, which turned out to be approximately eight months after the APA went into effect. (D.I. 146 Ex. D)[3] JFE alleges that, during this time, ICIA was basically a tenant

---

[1] It is undisputed that JFE is the successor-in-interest to KSC. (D.I. 146 at 3 n.2) Hence, hereinafter, KSC will often be referred to as JFE.

[2] The parties to the APA are KSP and ICIA. The parties to the Framework Agreement include KSC, KSP, and ICIA.

[3] The parties to the TSA are ICIA and "LNP Engineering Plastics, Inc." ("LNP"). (D.I. 146 Ex. D) KSP formed LNP solely for the purpose of operating the recycling business. (*Id.*) The parties have not disputed that SABIC, as successor-in-interest to KSP, is bound by the terms of the TSA.

under the TSA and that KSP exercised no supervision or control over the Teflon cleansing process. (D.I. 141 at 6)

In March 2002, General Electric ("GE") acquired KSP and the Santa Ana site from JFE; KSP was later merged into GE. (D.I. 145 at A545) At least by November 2002, GE discovered that the Santa Ana site was contaminated with perchlorate. (D.I. 145 at A523) GE, therefore, contacted the California Regional Water Quality Control Board and proposed to clean up the pollution. (D.I. 145 at A619) GE also notified JFE of its discovery of the contamination at the site. (D.I. 145 at A622) As part of the sale by JFE of KSP to GE, JFE had agreed to indemnify GE for certain liabilities, including costs for cleaning up the environmental pollution. (D.I. 145 at A550)

In turn, in January 2003, JFE contacted ICIA, notifying ICIA of the contamination at the Santa Ana site. (*Id.* at A638) JFE further explained to ICIA its expectation that ICIA would pay for the environmental liabilities incurred at the site and undertake the necessary clean-up of the site, which JFE believed ICIA was obligated to do under the 1991 APA. (*Id.*) ICIA responded by letter to JFE, which included the following: "We must advise you, however, that our reading of the 1991 Asset Purchase Agreement suggests that Kawasaki's right to indemnity has expired." (D.I. 145 at A640) Consistent with ICIA's interpretation of the APA, ICIA has failed to take any steps related to the remediation of the Santa Ana site.

Beginning in August 2003, GE requested payment from JFE for costs incurred in connection with responding to the pollution at the Santa Ana site. (*Id.* at A641) JFE has paid all such requests from GE. (*Id.* at A645-46; *id.* at A654) In 2007, GE sold the Santa Ana site (as well as other assets) to SABIC Engineering Plastics Holding, B.V., the parent of SABIC. (D.I.

3

141 at 9) By this transaction, SABIC was assigned all of GE's rights and liabilities in relation to the Santa Ana site. (*Id.*) SABIC, thus, was a successor-in-interest to KSP, an original signatory to the APA. (D.I. 146 Ex. K) Thereafter, SABIC assigned its claims under the APA to JFE. (D.I. 141 at 9; D.I. 146 at 9; D.I. 145 at A613) To date, JFE has incurred more than $6.7 million in costs responding to the perchlorate contamination at the Santa Ana site. (D.I. 145 at A646)

**B.     Pertinent Provisions of the Parties' Agreements**

As already noted, KSP and ICIA executed three agreements in 1991: the APA, the TSA, and the Framework Agreement. Several provisions of these agreements form the basis for the parties' present dispute.

Section 1.02 of the APA is entitled "Assumption of Liabilities." It divides up liabilities – "Assumed Liabilities" and "Retained Liabilities" – that the purchaser and seller agreed to satisfy:

> On the terms and subject to the conditions of this Agreement, the Purchaser [KSP] agrees, at the time of the Closing and effective from such time, to assume and satisfy the Assumed Liabilities, and *the Seller [ICIA] shall retain and satisfy the Retained Liabilities*.

(D.I. 146 Ex. C at 7) (emphasis added)

The "Assumed Liabilities," which JFE agreed by Section 1.02 to assume and satisfy, are identified in Schedule B. (*Id.* at Sch. B) Schedule D identifies the "Retained Liabilities," which under § 1.02 of the APA ICIA agreed to "retain and satisfy." (*Id.* at Sch. D) As pertinent here, paragraph 1 of the Schedule D "Retained Liabilities" provides:

> *All damages, loss, liabilities, claims or complaints (including, without limitation, reasonable expenses of investigation and attorneys' fees) relating to the Business or the Acquired Assets*

4

> *and arising out of liability under any Environmental Law*[4]
> including, without limitation, any use, generation, treatment,
> storage, transportation or disposal or release prior to the Closing of
> any Hazardous Substance or hazardous material or waste or any
> toxic or other material . . . .

(D.I. 146 Ex. C at Sch. D) (emphasis added)

Article XII of the APA deals with "Survival: Claim for Breach: Indemnification." In

particular, § 12.01, "Survival; Remedy of Breach," provides:

> The representations and warranties of the parties contained herein
> shall survive the Closing until the second anniversary of the
> Closing Date except for (i) the representations and warranties set
> forth in Section 3.14 which shall survive until the tenth anniversary
> of the Closing Date, and (ii) the representations and warranties set
> forth in Section 3.15(i) which shall survive until the third
> anniversary of the Closing Date. *The covenants and agreements*
> *of the parties which by their terms require performance or*
> *compliance on or after the Closing Date, as well as the*
> *indemnities set forth in this Article XII, shall continue in force*
> *thereafter in accordance with their terms.* Notwithstanding the
> provisions of this Section 12.01, any representation, warranty,
> covenant or agreement in respect of which indemnity may be
> sought under Section 12.02 or 12.03 shall survive the time at which
> it would otherwise terminate under this Agreement, if notice of the
> inaccuracy or breach thereof giving rise to such indemnity shall
> have been given prior to such time.

(D.I.146 Ex. C at 40) (emphasis added)

Next, § 12.02 is entitled "Indemnification from the Seller." It states:

> *The Seller [ICIA] shall indemnify and defend the Purchaser*
> *[KSP] against, and agrees to hold the Purchaser [KSP] harmless*

---

[4]The APA defines "Environmental Law" as "any Federal, State or local statute, rule,
regulation, or ordinance applicable to the Business relating to the generation, treatment, storage,
transportation, disposal or release of pollutants, contaminants, wastes, toxic or radioactive
material, [or] Hazardous Substances . . . in force at the date hereof or at any time prior to the
Closing Date." (D.I. 146 Ex. C at 3)

> *from, any and all damage, loss, liability and expense (including,*
> *without limitation, reasonable expenses of investigation and*
> *attorneys' fees) incurred or suffered by the Purchaser [KSP]*
> *arising out of* (i) any misrepresentation or breach of covenant,
> agreement, representation or warranty of the Seller [ICIA] in this
> Agreement or *(ii) any claim, action or proceeding relating to the*
> *Retained Liabilities.* No claim for indemnification with respect to
> Clause (i) of this Section 12.02 shall be made more than two (2)
> years after the Closing Date except that claims for indemnification
> under Section 3.14 may be made up to ten (10) years after the
> Closing Date, and claims for indemnification under Section 3.15(i)
> may be made up to three (3) years after the Closing Date. *With*
> *respect to Clause (ii) of this Section 12.02, claims for*
> *indemnification based upon the Retained Liabilities described in*
> *paragraph 1 of Schedule D may be made up to ten (10) years*
> *after the Closing Date;* claims for indemnification based upon the
> Retained Liabilities described in paragraphs 2, 3, 4, and 5
> respectively of Schedule D may be made up to five (5) years after
> the Closing Date; and claims for indemnification based upon the
> Retained Liabilities described in paragraphs 6, 7, 8, 9 and 10
> respectively may be made at any time after the Closing Date.

(*Id.* at 40-41) (emphasis added)

Turning to the TSA, § 8.2 is entitled "Cross Indemnities." It contains the following

subsection (c):

> *ICIA will indemnify and hold harmless LNP from any and all*
> *liabilities, actions or damages arising out of the noncompliance*
> *by ICIA during the term hereof with any Environmental Law (as*
> *defined in the Asset Purchase Agreement) in connection with its*
> *operations at the Facility [i.e., the Santa Ana site] or the use or*
> *generation by ICIA of hazardous substances or toxic wastes in*
> *connection with its operations at the Facility, during the term*
> *hereof* . . . .

(D.I.146 Ex. D at 7) (emphasis added)

Finally, the Framework Agreement, in § 3.05, entitled "Guarantee of the Sellers (ICIA)

Obligations," provides that Defendant ICI "shall guarantee the performance of ICIA . . . under

this Agreement and the Sale and Purchase Agreements." (D.I. 146 Ex. B at 8) Section 3.01(c)

further provides that "[t]he liability of any and all of the sellers [including ICIA] *shall terminate as set forth in the various Sale and Purchase Agreements* . . . . " (D.I. 146 Ex. B at 6) (emphasis added) The Framework Agreement also caps ICIA's liability for "any claim, action or proceeding relating to the Retained Liabilities described under paragraphs 1 to 5 inclusive of Schedule D of the [APA]," as these "shall not exceed in the aggregate thirty million U.S. dollars." (*Id.* at 5)

### C. Litigation Among the Parties

Plaintiffs originally sued Defendants in October 2006 in the Northern District of Ohio. (D.I. 1) In September 2008, ICIA's motion to transfer was granted. (D.I. 44) Consequently, the case was transferred to this District.

Plaintiffs filed the operative Second Amended Complaint ("Complaint") on May 1, 2009. (D.I. 78) It consists of 17 counts. Counts I through IV arise under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* (2006). Under CERCLA, JFE seeks cost recovery against ICIA (Count I), and also seeks cost recovery against ICIA by asserting the rights it has been assigned by GE and/or SABIC (Count II). In Count III, SABIC seeks to recover its response costs from ICIA. Then, in Counts IV and V, JFE and SABIC, respectively, seek a declaratory judgment establishing the joint and several liability of ICIA for response costs incurred in connection with the contamination of the Santa Ana site. Counts VI through VIII are breach of contract claims. Specifically, Plaintiffs allege that ICIA has breached the APA (Count VI) and the TSA (Count VII). They also allege that ICI has breached the Framework Agreement (Count VIII). Next, Counts IX through XIII allege various common law and statutory claims arising under state law (including continuing

7

private nuisance, continuing trespass, and equitable indemnification). Finally, Counts XIV through XVII seek declaratory judgments relating to Defendants' liabilities.

The parties filed their motions for summary judgment in June 2010. (D.I. 139, 140, 142) The case was reassigned to the undersigned District Judge in August 2010. The Court heard oral argument on the motions on October 14, 2010. (D.I. 167 ("Tr."))

## III.    LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be – or, alternatively, is – genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

8

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV.   **DISCUSSION**

The claims in the Complaint can be divided into three basic categories: (1) CERCLA claims; (2) breach of contract claims; and (3) the remaining state law claims. Plaintiffs seek partial summary judgment on the CERCLA claims and the breach of contract claims, while Defendants seek summary judgment on all of Plaintiffs' claims. The crux of the parties' disputes turns on whether the ten-year time limit of the § 12.02 indemnification provision in the 1991 APA bars each of JFE's causes of action.

ICIA argues that all of JFE's claims are really indemnification claims that are artfully

9

pled as CERCLA or breach of contract claims. (D.I. 153 at 8) In ICIA's view, the parties negotiated over environmental liabilities and agreed that ICIA would retain liability for pre-closing environmental liabilities for a period of ten years, as reflected in § 12.02. In this way, the APA allocates *all* environmental liabilities relating to the Santa Ana site. The indemnification provision is broad enough, in ICIA's view, to include all claims relating to environmental liability, including CERCLA and breach of contract claims. (D.I. 146 at 16)

JFE responds that § 1.02 of the APA, dealing with Assumed Liabilities, mandates that ICIA is liable for the Schedule D Retained Liabilities indefinitely, and these Retained Liabilities expressly include environmental matters. JFE notes that § 1.02 contains no time limitation. (D.I. 143 at 16) JFE also points to § 12.01, which provides "the covenants and agreements of the parties which by their terms require performance or compliance on or after the Closing Date, *as well as the indemnities set forth in this Article XII*, shall continue in force thereafter in accordance with their terms." (D.I. 146 Ex. C at 40) (emphasis added) In JFE's view, therefore, the fact that § 12.01 includes references both to covenants and agreements, as well as indemnities covered in the indemnification provision, demonstrates that the indemnification provision cannot have been intended to cover all liabilities or claims potentially arising from the APA. Under JFE's reading, "Just because 1.02 provides for a separate and independent covenant that is not limited in duration does not render 12.02's ten year period for indemnification claims meaningless." (D.I. 156 at 3)

At bottom, the parties' competing arguments present multiple, sometimes overlapping issues. For clarity's sake, the Court will first evaluate JFE's CERCLA-based claims and any background issues that these claims raise. Then, the Court will turn to JFE's breach of contract

10

claims, again addressing any related background issues in connection with the discussion of the breach of contract claims. Finally, the Court will briefly address the remaining state law causes of action.

### A.   CERCLA Claims (Counts I-V)

#### 1.   CERCLA and Indemnification

CERCLA was enacted in 1980 in response to the "serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 55 (1998). CERCLA is a strict liability statute. *See* 42 U.S.C. §§ 9601 *et seq.*; *Burlington Northern & Santa Fe Ry. v. United States*, 129 S. Ct. 1870, 1878 (2009). CERCLA is "designed to promote the cleanup of hazardous waste sites and to ensure that cleanup costs are borne by those responsible for the contamination." *Burlington Northern*, 129 S. Ct. at 1872.

To establish liability under § 107 of CERCLA,[5] a plaintiff must satisfy the following test: (1) that the site under consideration is a "facility;" (2) that there has been a release of a hazardous substance at the site; (3) that the release caused the plaintiff to incur costs responding to the release of the hazardous substance; and (4) that the alleged tortfeasor – here, ICIA – falls under the category of a "potentially responsible party."[6] *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 668 (5th Cir. 1989) (internal citations omitted). ICIA does not seriously dispute that all four prongs of the test are satisfied in this case: "The only issue in dispute is whether the ten-year

---

[5]Following the practice of most courts, the Court will refer to individual sections of CERCLA instead of the sections of the United States Code. *See, e.g., E.I. DuPont de Nemours & Co. v. United States*, 508 F.3d 126, 128 n.1 (3d Cir. 2007).

[6]In pertinent part, the statute provides that "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of . . . shall be liable . . . ." 42 U.S.C. § 9607(a)(2).

11

limit in the APA applies to every claim JFE may assert against ICIA with regard to an environmental condition at the Santa Ana property that was unknown at the time JFE acquired the Specialty Compounds Business." (D.I. 146 at 4; Tr. at 5; *see also id.* at 18) ICIA's argument, instead, is that the parties "negotiated a clear ten-year limit on ICIA's liability." (Tr. at 5)

Parties may contractually indemnify each other with respect to liability under CERCLA. CERCLA itself provides:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1) (2006). Courts have interpreted this provision to mean that parties may not extinguish CERCLA liability *vis a vis* the government, but that parties may contractually allocate CERCLA liability among themselves. *See Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 107 (3d Cir. 2005) ("[Courts] have uniformly reconciled the first and second sentences by holding that responsible parties cannot contract away their liability under CERCLA for cleaning up a release, but that they may allocate the ultimate financial burden of that clean-up by agreements among themselves."); *SmithKline Beecham Corp. v. Rohm and Haas Co.*, 89 F.3d 154, 158 (3d Cir. 1996) ("We have reconciled these apparently inconsistent provisions by interpreting them to mean agreements to indemnify or hold harmless are enforceable against the parties but not against the government.").

12

## 2. <u>1991 APA Indemnification Clause</u>

The Court must next determine whether the indemnification provision at issue in this case – § 12.02 of the APA, in conjunction with Schedule D "Retained Liabilities" – is broad enough to cover CERCLA claims. If the indemnification provision is broad enough, then claims brought pursuant to CERCLA are covered by the ten-year time limit contained in § 12.02. The Court concludes that the APA indemnification provision does include CERCLA liabilities (and similar liabilities arising under the California Hazardous Substance Account Act).[7]

In *DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F. Supp. 1132 (D. Del. 1996), the parties' indemnification agreement provided: "Purchaser agrees to indemnify, defend and hold harmless . . . from any claims, costs (including reasonable attorneys fees and court and arbitration costs), expenses, direct or indirect, causes of action, penalties, liabilities, losses and damages actually sustained and incurred by Seller . . . arising from, alleged to arise from, or caused by, in whole or in part, the condition of the Premises and *specifically including any state or federal environmental claims* arising because of hazardous material." *Id.* at 1134-35 (emphasis added). The court held in *DRR* that the plaintiff's allegation of a violation of a state environmental statute "falls directly within the indemnification provision." *Id.* at 1142. The indemnification provision at issue here is similarly broad, specifically referencing "any Environmental law," which is further defined as "any Federal, State or local statute, rule, regulation or ordinance." (D.I. 146 Ex. C at 41; *see also id.* at Sched. D) The Court is persuaded that, as in *DRR*, the indemnification provision here encompasses CERCLA liabilities (and similar state

---

[7]*See* Cal. Health & Safety Code § 25300, *et seq*; *see also* Del. Code Ann. tit. 7, § 9101, *et seq.* (1991).

environmental liabilities) for the parties that are contractually bound by the APA.

JFE argues that in order for the APA to preclude CERCLA claims, the APA must include either (1) an "express statement that indemnification . . . is the . . . sole and exclusive remedy" or (2) "an express assumption of CERCLA liability." (D.I. 157 at 4) JFE's argument, however, is misplaced. There is no indication that the indemnification provision in *DRR* contained such explicit language.[8] Numerous other cases similarly hold that indemnification provisions do not need to expressly reference CERCLA, so long as the indemnification recited in the provision is broad enough to encompass CERCLA liability. *See, e.g., Horsehead Indus., Inc. v. Paramount Comm'ns, Inc.*, 258 F.3d 132, 143 (3d Cir. 2001) ("Moreover, in the context of asset purchase or transfer agreements, courts (including this Court) have held that CERCLA claims are subsumed within broad contractual indemnification provisions."); *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 621 (7th Cir. 1994) (finding that contract did not need to specifically reference CERCLA to transfer liability under CERCLA); *see also SmithKline Beecham Corp. v. Rohm and Haas Co., et. al.*, 89 F.3d 154, 160 (3d. Cir. 1996) (reading indemnification provision broadly to include CERCLA costs, even though indemnification provision predated CERCLA's enactment).

At oral argument, JFE relied heavily on the *Southland* and *Silgan* cases. *See Southland Corp. v. Ashland Oil, Inc.*, 696 F. Supp. 994 (D.N.J. 1988); *Silgan White Cap Ams., LLC v. Alcoa Closure Sys.*, 2009 U.S. Dist. LEXIS 36272 (W.D. Pa. Apr. 29, 2009). Both cases are

---

[8]JFE attempts to distinguish *DRR* by pointing to language suggesting that DRR's counsel acknowledged that the "Contract of Sale clearly cast the environmental responsibility on [purchaser]." (D.I. 157 at 6) But this statement in *DRR* comes in the background section and does not seem to factor into the *DRR* court's analysis of the underlying legal issue. *See DRR*, 949 F. Supp. at 1142. Instead, in the discussion section of the opinion, the court in *DRR* merely explained that parties may contractually allocate CERCLA liability, and that the indemnification provision in the operative contract covered CERCLA claims.

distinguishable. *Southland* notes that in order for a contract to shift CERCLA liabilities, it must contain an express provision allocating CERCLA or "CERCLA-like" liability. 696 F.Supp. at 1002. The indemnification provision at issue in *Southland* appears not to have included such language. Here, however, the APA ***does*** include such a provision: both the Retained Liabilities and the indemnification provision specifically contemplate ***any*** federal, state, or local "environmental laws," which clearly encompasses "CERCLA-like" statutes.

In *Silgan*, the issue was not whether the indemnification provision was broad enough to include CERCLA liability; instead, *Silgan* asked whether the indemnification provision was the "sole and exclusive remedy." 2009 U.S. Dist. LEXIS 36272, at *35 ("The Court now turns to the applicable provisions to determine whether an action for contractual indemnification is the sole and exclusive remedy under the Agreement."). Because the *Silgan* court determined that the indemnification provision was not the sole and exclusive remedy available under the Agreement there, the Court allowed the CERCLA claims to proceed. *See id.* The Court will address the sole and exclusive remedy issue in the next section. *Silgan* does not, however, advance JFE's argument that the APA's indemnification provision in this case is too narrow to reach CERCLA and CERCLA-like liabilities.[9]

The indemnification provision in this case provides that claims for indemnification based on the Schedule D Retained Liabilities may be brought within ten years of the closing date. (D.I. 146 Ex. C at 41) Schedule D includes all damages arising out of liability under any environmental law, which is further defined in the APA as broadly as it possibly could be. (*Id.* at Sch. D; *see also id.* at 3) Accordingly, the Court finds that the indemnification provision is broad

---

[9]The Court also notes that *Silgan* is not binding authority on this Court.

15

enough to include CERCLA claims.

### 3.    Application to CERCLA Claims in Complaint (Counts I-V)

The § 12.02 indemnification provision provides a ten-year time period during which JFE could pursue indemnification claims brought under CERCLA. JFE asserts five causes of action based on CERCLA. (D.I. 78; D.I. 141) The Court will now apply its background determinations to each of the CERCLA causes of action in the Complaint.

#### a.    Count I: JFE CERCLA cost recovery action vs. ICIA

JFE purports to bring two different categories of CERCLA claims. As counsel clarified at oral argument, "JFE holds two different kinds of CERCLA claims, two categor[ies] of claims. It holds claims in its own right. It also holds claims by assignment." (Tr. at 35) JFE explained that "JFE . . . is wearing two hats. That gets confusing . . . ." (Tr. at 31) Claims I and IV are brought by JFE directly, as a party that has incurred response costs related to the spill. (D.I. 78 at 14-18) Claims II and V are claims that GE and SABIC have assigned to JFE. (*Id.* at 15-17) Claim III is a claim brought by SABIC directly. The distinctions are important, in JFE's view, because the APA cannot extinguish any rights under CERCLA for parties that were not signatories to the APA.

JFE thus argues that any limitation contained in the APA, including any ten-year time-limit contained in the indemnification provision, is inapplicable to JFE's purported direct CERCLA claims because JFE is not a party to the 1991 APA and, hence, cannot be bound by its terms. The parties to the 1991 APA were ICIA and KSP. (D.I. 146 Ex. C; D.I. 152 at 16) In JFE's view, because JFE is not the successor-in-interest to KSP but, instead, is the successor-in-interest to the twice-removed parent of KSP – that is, KSC – the APA is irrelevant to JFE's

16

independent CERCLA claims. (D.I. 152 at 16) Under this view, even accepting for argument's sake that the APA contains a ten-year limitation, that limitation is not applicable to non-party JFE.

JFE is only half-correct. ICIA could not allocate its CERCLA liability universally by entering into a contract with a single entity. *See, e.g., Fisher Dev. Co. v. Boise Cascade Corp.*, 37 F.3d 104, 107 (3d Cir. 1994) (explaining that "responsible parties cannot contract away their liability under CERCLA for cleaning up a release, but that they may allocate the ultimate financial burden of that clean-up by agreements among themselves"). Here, however, KSC, which JFE concedes is the predecessor-in-interest to JFE, is a party to the Framework Agreement. (D.I. 157 at 2 n.1; *see also* D.I. 146 Ex. B) The Framework Agreement, in essence, is KSC's guarantee that, among other things, KSP will comply with its obligations under the APA. JFE cannot brush aside the Framework Agreement and its own obligations under it.

Another problem for JFE is that, although it is not a party to the APA, it is "closely related" to KSP (as successor-in-interest to KSC), which is a party to the APA. It would be foreseeable that JFE, although a non-signatory to the APA, would be held to its terms. *See, e.g., Hadley v. Shaffer*, 2003 U.S. Dist. LEXIS 14106, at *10-11 (D. Del. Aug. 12, 2003) (applying Delaware law); *see also Holland Am. Line, Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007) ("We held that the forum selection clause applied to all defendants, even though only Gucci Parfums signed the contract, because where the alleged conduct of the nonparties is closely related to the contractual relationship, a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses."); *Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993) ("In order to bind a nonparty to a forum selection clause, the party

must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound."). The close relationship between KSC, JFE's predecessor, and KSP, the signatory to the APA, is illustrated by the facts that KSC was KSP's parent and that, in the Framework Agreement, KSC guaranteed KSP's performance under the APA. (D.I. 146 Ex. B) Likewise, the foreseeability that JFE would be bound by KSP's execution of the APA is reflected in JFE's own briefing, which states: "Effective October 3, 1991, Kawasaki Steel Corporation n/k/a JFE ("KSC") along with certain subsidiaries such as Kawasaki Steel Plastics ("KSP") . . . entered into a transaction with ICI and certain of its subsidiaries to purchase certain assets." (D.I. 143 at 4) Just as JFE is entitled to the benefits of being treated as a party to the APA – for instance, JFE could have asserted a claim for breach of the APA (subject to all other provisions of the APA) – so, too, must it be subject to the limitations of the APA. *See generally In re Kaiser Group Int'l, Inc.*, 307 B.R. 449, 456 (D. Del. 2004) ("[A] non-signatory should be prevented from embracing a contract on the one hand and then turning its back on those portions of the contract which it finds distasteful.") (internal citations omitted).

In Count I, JFE seeks indemnification for CERCLA liabilities. However, it is undisputed that JFE provided ICIA notice of this claim no earlier than 2002, which was more than ten years after execution of the 1991 APA. Under the APA, therefore, JFE's claim for CERCLA indemnification is untimely. Accordingly, the Court will deny JFE's motion for summary judgment as it applies to Count I and will grant ICIA's motion for summary judgment on Count I.

### b. Count II: JFE's assertion of SABIC's CERCLA cost recovery rights against ICIA

In Count II, JFE asserts the rights that SABIC, as successor-in-interest to KSP, possessed under the APA and subsequently assigned to JFE. It is undisputed that JFE gave notice to ICIA of the contamination at the Santa Ana site in 2002. As set forth earlier in this Opinion, the APA's indemnification provision covers CERCLA claims and provides a ten-year limit within which such claims may be brought. As the APA was executed in October 1991, SABIC's right to pursue indemnification for recovery of costs expended under CERCLA expired in October 2001. Accordingly, the Court will deny JFE's motion for summary judgment on Count II and grant Defendants' motion for summary judgment on Count II.

### c. Count III: SABIC's cost recovery rights against ICIA

SABIC also seeks to assert, directly and on its own behalf, its right to recover costs under CERCLA against ICIA. However, these rights were assigned by SABIC to JFE. (D.I. 141 at 9; D.I. 145 at A613) Accordingly, SABIC lacks standing to assert this claim. *See Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112-13 (3d Cir. 1993) (noting that assignments extinguish assignor's right to assert legal claims). The Court will enter summary judgment for Defendants on Count III.[10]

### d. Count IV: JFE CERCLA declaratory judgment claim

The analysis already provided with respect to Count I applies equally to Count IV. Accordingly, with respect to Count IV, the Court will deny JFE's motion for summary judgment and grant Defendants' motion for summary judgment.

---

[10]JFE fears that ICIA may eventually contend that the assignment from SABIC to JFE is invalid. The Court has no basis to question the validity of this assignment at this time.

19

e.    **Count V: SABIC CERCLA declaratory judgment claim**

As already noted, SABIC lacks standing, as it has assigned its claims to JFE. Accordingly, the Court will deny SABIC's motion for summary judgment and grant judgment for Defendants on Count V.[11]

## B.    **Breach of Contract Claims**

With respect to the breach of contract claims, the parties raise two preliminary issues that require the Court's attention. First, the parties dispute whether indemnification is the sole and exclusive remedy available under the APA. Second, the parties disagree about the proper statute of limitations that applies to their breach of contract claims. The Court will now address each of these issues before turning to the Counts in the Complaint.

### 1.    **Sole and Exclusive Remedy**

The parties dispute whether the right to indemnification addressed in § 12.02 of the APA – including the ten-year time limit on claims listed in Schedule D – is the only remedy available under the contract. ICIA argues that the ten-year limitation on indemnification applies to all potential causes of actions relating to environmental liabilities that JFE may bring, no matter how JFE pleads the claim. (D.I. 146 at 17) JFE, however, contends that ICIA is implying an exclusivity requirement that does not exist in the APA; moreover, in JFE's view, Delaware case law mandates that any exclusivity provision must be explicit in the contract. (D.I. 143 at 17) To JFE, ICIA is trying to read into the APA an implied limitation that indemnification is the "sole and exclusive remedy" available to JFE. (*Id.*) At oral argument, ICIA confirmed that it is,

_____

[11]Because SABIC lacks standing, the Court will grant summary judgment to Defendants on all counts asserted by SABIC. Accordingly, the remainder of the Court's discussion of the Complaint only addresses JFE's rights, and not SABIC's.

indeed, reading the APA as imposing a ten-year period in which JFE may bring *any* claims relating to environmental liabilities: "No matter what claim they bring, the remedy is limited by the 10-year time period." (Tr. at 3-4)

The Court rejects ICIA's reading of the APA. Delaware law requires that parties intending to make indemnification the only remedy available between them to do so explicitly and unequivocally. *See Silgan*, 2009 U.S. Dist. LEXIS 36272, at *34 ("Delaware courts recognize that although the parties may, in their contract, specify a remedy for a breach, that specification does not exclude other legally recognized remedies. An agreement to limit remedies must be clearly expressed in the contract.") (internal citations and quotation marks omitted); *Oliver B. Cannon & Son v. Dorr-Oliver*, 336 A.2d 211, 214 (Del. 1975) ("First, the contractual remedy cannot be read as exclusive of all other remedies since it lacks the requisite expression of exclusivity."); *Interim Healthcare v. Spherion Corp.*, 884 A.2d 513, 549 (Del. Super. Ct. 2005) (explaining that Delaware law requires express language for limitations on remedy); *see also* 17A Am.Jur. 2d Contracts § 709 (2004).

The APA lacks such clarity. Section 12.02 provides that *"claims for indemnification based upon the Retained Liabilities . . . may be made up to ten (10) years after the Closing Date."* (D.I. 146 Ex. C at 41) (emphasis added) The phrase "[c]laims for indemnification" does not automatically include claims for other causes of action that are *not* indemnification. The APA does not contain any clear expression of the parties' intent to limit the available remedies with respect to environmental liability to indemnification, or to limit all remedies to a ten-year period. *See E\*Trade Fin. Corp. v. Deutsche Bank AG*, 374 Fed. Appx. 119, 121-22 (2d Cir. Mar. 30, 2010) (rejecting party's attempt to bring different actions when agreement included "sole and

21

exclusive" remedy provision).

Therefore, the Court concludes that, under the APA, only claims for indemnification are subject to the ten-year limitation.

### 2. **Breach of Contract Statute of Limitations**

JFE argues that Ohio's statute of limitations is applicable. Ohio's statute of limitations for a breach of contract claim is fifteen years. *See* Ohio Rev. Code § 2305.06.[12] Defendants, on the other hand, insist that Delaware's statute of limitations should apply. Delaware's statute of limitations for breach of contract claims is only three years. *See* 10 Del. C. § 8106. Hence, JFE's breach of contract claim is timely if Ohio's statute of limitations applies but is untimely if the Court applies Delaware's shorter limitations period.

This case was initially filed in the Northern District of Ohio (D.I. 16), and then transferred here pursuant to 28 U.S.C. § 1404(a).[13] (D.I. 44) When a defendant transfers an action to a different federal district court, the transferee court must apply the same law that the transferor court would have applied. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). This includes choice-of-law provisions, as "the transferee court must follow the choice

---

[12]A 2005 legislative amendment that might otherwise have affected the statute of limitations issue here is inapplicable, as Ohio statutes do not apply retroactively absent explicit legislative direction to do so. *See* Ohio Rev. Code § 2305.03(B); *see also* Ohio Rev. Code Ann § 2305.06; *State v. Lasalle*, 96 Ohio St. 3d 178, 180 (Ohio 2002) (explaining that laws apply prospectively unless express language in legislation dictates otherwise); *Arandell Corp. v. Am. Elec. Power Co.*, 2010 U.S. Dist. LEXIS 96372 (S.D. Ohio Sept. 15, 2010) (declining to apply Ohio's borrowing statute retroactively).

[13]In pertinent part, 28 U.S.C. §1404(a) provides, "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The parties to the Framework Agreement agreed to submit to personal jurisdiction in the State of Delaware. (D.I. 146 Ex. B at 12)

of law rules that prevailed in the transferor court." *Ferens v. John Deere Co.*, 494 U.S. 516, 524-27 (1990) (internal citations omitted); *see also* James W. Moore et al., *Moore's Federal Practice* § 111.20 1(a) (3d ed. 1997). The Northern District of Ohio would apply Ohio choice-of-law principles to this case. *See Travelers Cas. & Sur. Co. v. Ins. Co. of N. Am.*, 609 F.3d 143, 170 (3d Cir. 2010) (stating federal courts are bound by choice-of-law principles of state in which they are located); *see also National Union Fire Ins. co. v. Watts*, 963 F.2d 148, 150 (6th Cir. 1992) (same). Accordingly, this Court is required to apply Ohio choice-of-law principles as well.

As both parties recognize, Ohio follows the Restatement (Second) of Conflict of Laws ("the Restatement"). *See Morgan v. Biro Mfg. Co.*, 474 N.E.2d 286, 288-89 (Ohio 1984) ("We hereby adopt the theory stated in the *Restatement of the Law of Conflicts* . . . ."); *see also* D.I. 159 at 8; D.I. 152 at 19. The parties nevertheless disagree about which version of the Restatement – the 1971 version or a revised 1988 version – the Ohio Supreme Court would apply when there are conflicts as to the appropriate statute of limitations. JFE contends that the 1971 version of § 142 of the Restatement applies, while ICIA argues that it is the 1988 version.

JFE, in arguing that the original (1971) version of § 142 applies, relies heavily on the Sixth Circuit's decision in *Cole v. Mileti*, 133 F.3d 433 (6th Cir. 1998). There, the parties to a transaction had adopted a choice of law provision mandating that California state law, rather than Ohio law, would apply to any dispute. California's statute of limitations, however, was shorter than Ohio's, and under California's statute of limitations the plaintiff's claim would have been time-barred. The Sixth Circuit, applying Ohio law, noted that "[a]bsent an express statement that the parties intended another state's limitations statute to apply, the procedural law of the forum governs time restrictions on an action for breach, while the law chosen by the parties governs the

terms of their contract." *Id.* at 437. The Sixth Circuit's ruling was consistent with and based on

Restatement § 142(2), which dictated that the Ohio statute of limitations governed. However, the

version of § 142 on which the *Cole* court relied (without explanation) was the original, 1971

version, which merely stated that an action could proceed if the action was not barred by the

statute of limitations of the forum state. *Cole* made no reference to the revised, 1988 version of §

142.

> The revised 1988 Restatement provides:

>> The following § 142 replaces the original §§ 142 and 143:
>> "Whether a Claim will be maintained against the defense of the
>> statute of limitations is determined under the principles stated in
>> § 6. In general, unless the exceptional circumstances of the case
>> make such a result unreasonable:

>>> (1) The forum will apply its own statute of
>>> limitations barring the claim.

>>> (2) The forum will apply its own statute of
>>> limitations permitting the claim unless:

>>>> (a) maintenance of the claim would
>>>> serve no substantial interest of the
>>>> forum; and

>>>> (b) the claim would be barred under
>>>> the statute of limitations of a state
>>>> having a more significant
>>>> relationship to the parties and the
>>>> occurrence."

Restatement (Second) of Conflicts of Laws § 142 (1988).

Under this revised version of § 142, Delaware's statute of limitations would most likely

apply, since application of Ohio's statute of limitations would appear not to serve any substantial

interest of Ohio and Delaware has the "most significant relationship to the parties and the

occurrence." Indeed, as the Northern District of Ohio found, "Here, Ohio has no connection to this case whatsoever." (D.I. 44 at 4)

One federal district court decision in Ohio has expressly held that the Ohio Supreme Court, if faced with the question, would abandon Ohio's reliance on the rigid procedure-substance dichotomy embodied in the older version of § 142 in favor of the more flexible approach found in the revised version. *See Curl v. Greenlee Textron, Inc*, 404 F.Supp.2d 1001, 1009-10 (S.D. Ohio 2005) (examining whether Ohio Supreme Court would choose to adopt revised version of Restatement and declining to apply Ohio's 15-year statute of limitations). This decision, however, appears to be an outlier. As other federal district court decisions have noted, Ohio state courts have continued to apply the older version of § 142. *See Dudek v. Thomas & Thomas Attys. & Counselors at Law, LLC*, 702 F. Supp. 2d 826, 834 (N.D. Ohio 2010) ("Despite this revision, Ohio courts continue to apply the original version of § 142."); *Ormond v. Anthem, Inc.*, 2008 U.S. Dist. LEXIS 30230, at \*56 (S.D. Ind. Mar. 31, 2008) ("Ohio courts . . . have consistently applied the approach embodied by the original version of § 142. . . . In the face of this nearly universal application of the original version of § 142, the Ohio Supreme Court has remained silent.").

Given this line-up, the Court predicts that, if the Ohio Supreme Court were confronted with the question now before this Court, the Ohio Supreme Court would apply the older version of § 142(2). This is the conclusion reached by the Sixth Circuit in *Cole* and, based on the cases cited to the Court and the Court's own research, by all district courts that have looked at the issue other than *Curl*. It is based, too, on the nearly-universal actions of the lower Ohio state courts, which have continued to apply the older version of § 142(2), notwithstanding its 1988 revision or

the Southern District of Ohio's prediction in *Curl*. *See Capital One Bank (USA), N.A. v. Rodgers*, 2010 Ohio App. LEXIS 3723 (Ohio Ct. App. 2010) (applying, without discussion, earlier version of § 142(2)); *Nationwide Mut. Fire Ins. Co. v. Rose*, 2007 Ohio App. LEXIS 1136 (Ohio Ct. App. 2007) (same).

Therefore, the Court will apply Ohio's fifteen-year statute of limitations to JFE Steel's breach of contract claims. Accordingly, JFE Steel's breach of contract claims are timely.

### 3.     Applicable Principles of Contract Interpretation

The parties are in agreement as to the essential principles of Delaware law that apply to the Court's interpretation of the APA. (D.I. 143 at 14; D.I. 146 11-12) Under Delaware law, contract interpretation is a question of law. *See Rhone-Polenc Basis Chems. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). A court applying Delaware law to interpret a contract is to effectuate the intent of the parties. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Accordingly, the Court must first determine whether a contract is unambiguous as a matter of law. *See Nw. Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996); *GB Biosciences Corp. v. Ishihara Sangyo Kaisha, Ltd.*, 270 F. Supp. 2d 476, 481-82 (D. Del. 2003). If the language of the contract is unambiguous, the Court interprets the contract based on the plain meaning of the language contained on the face of the document. *See GB Biosciences*, 270 F. Supp. 2d at 482 ("The use of extrinsic evidence to interpret clear and unambiguous language in a contract is not permitted.") (internal citations omitted); *see also Lorillard Tobacco*, 903 A.2d at 739. A contract is ambiguous only if it is fairly or reasonably susceptible to different interpretations. *See Esmark*, 672 A.2d at 43.

If a contract is unambiguous, the Court should interpret it as a matter of law, making

26

summary judgment potentially appropriate. *See Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998). Delaware principles of contract interpretation also require the Court to "read a contract as a whole" and "give each provision and term effect, so as not to render any part of the contract mere surplussage." *Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (internal citations and quotation marks omitted). Delaware adheres to the "objective theory of contracts," which means that a contract should be interpreted as it "would be understood by an objective, reasonable third party." *Id.* Finally, when two sophisticated parties bargain at arm's length and enter into a contract, the presumption is even stronger that the contract's language should guide the Court's interpretation. *See Progressive Int'l Corp v. E.I. du Pont de Nemours & Co.*, 2002 Del. Ch. LEXIS 91, at *22 (Del. Ch. July 9, 2002). The parties further agree that the plain language of the APA is all that the Court needs to look at in choosing between their competing interpretations and need not also consider any extrinsic evidence. (Tr. at 19; Tr. at 27)

### 4.    Application to Breach of Contract Claims (Counts VI-VIII)

JFE asserts three breach of contract claims, all of which were assigned to it by SABIC. SABIC is the successor-in-interest to KSP, which was a signatory to the APA and the TSA; and the parties have not disputed that SABIC, as the successor to KSP, which formed LNP (a signatory to the Framework Agreement), may enforce the Framework Agreement. (D.I 146 Ex B; *id.* at Ex. C; *id.* at Ex. D) Thus, for purposes of the breach of contract claims, JFE is bound by the terms of the APA, the TSA, and the Framework Agreement in the same way that SABIC would have been bound. (Tr. at 30)

### a.    Count VI: JFE breach of contract claim under the APA

JFE contends that ICIA breached the APA by failing to comply with § 1.02. In JFE's

view, § 1.02 – providing "Seller shall retain and satisfy the Retained Liabilities" – requires ICIA

to retain the Retained Liabilities indefinitely. (D.I. 156 at 1)  ICIA's contrary interpretation,

according to JFE, would leave several terms in the contract without any meaning. (*Id.* at 2)

ICIA contends, however, that JFE's claim that Defendants breached the APA is really just

an indemnification claim and, therefore, must be brought within ten years of execution of the

APA. ICIA relies heavily on *CertainTeed Corp. v. Celotex Corp.*, 2005 Del. Ch. LEXIS 11 (Del.

Ch. Jan. 24, 2005). In *CertainTeed*, the Delaware Court of Chancery stated: "In the context of a

merger or asset acquisition, the term 'indemnification' refers generally to the responsibility

retained by the seller to make the buyer whole for liabilities related to the assets sold or for

breaches of representations and warranties." *Id.* at *10. In reviewing the asset purchase

agreement at issue in *CertainTeed*, the Vice Chancellor found that the reference to

"indemnification" was not to the common-law right known as "indemnity." *Id.* However, the

agreement in *CertainTeed* differed from the APA because in the APA, unlike in *CertainTeed*,

indemnification is not the "sole and exclusive remedy." *Id.* at *30 n.42.[14]

It is undisputed that JFE has made payments to GE as a result of contamination at the

Santa Ana site. It is further undisputed that ICIA has refused to compensate JFE for those

payments. Under the Court's reading of the APA, ICIA, by agreeing to retain and satisfy the

Retained Liabilities, is obligated to compensate JFE. By failing to do so, ICIA has breached the

APA. Accordingly, the Court will grant summary judgment to JFE on Count VI and will deny

---

[14]The statements on which ICIA seeks to rely in *CertainTeed* appear to be dicta.

Defendants' motion for summary judgment on Count VI.[15]

**b.    Count VII: JFE breach of contract claim under the TSA**

The TSA is a supplemental lease agreement between the parties that allowed ICIA to

continue its Teflon recycling process at the Santa Ana site for an unspecified amount of time

(which turned out to be eight months) after its sale to KSP.  (D.I. 153 at 18)  The TSA, like the

APA, contains an indemnification provision.  Section 8.2(c) of the TSA provides:

> ICIA will indemnify and hold harmless [LNP] from any and all
> liabilities, actions, or damages arising out of the noncompliance by
> ICIA during the term hereof with any Environmental Law (as
> defined in the Asset Purchase Agreement) in connection with its
> operations at the Facility *or the use or generation by ICIA of*
> *hazardous substances or toxic wastes in connection with its*
> *operations at the Facility, during the term hereof,* including by
> not limited to reasonable attorneys' fees . . . .

(D.I. 146 Ex D at 7) (emphasis added)  JFE argues that ICIA breached the TSA by causing

contamination at the Santa Ana site, which would violate environmental laws, and by use of

hazardous substances or toxic wastes, during the eight-month term of the TSA.  ICIA counters by

arguing that all of JFE's supposed evidence is "speculation."

The Court finds that JFE has met its burden of demonstrating that there are no genuine

issues of material fact and that summary judgment is appropriate.  While there are disputed facts

as to whether ICIA caused damage by noncompliance with environmental laws during the

pertinent eight-month period,[16] the TSA makes clear that ICIA retained responsibility for

---

[15]The Court notes here that JFE's motion for summary judgment seeks only a resolution
of the contract interpretation issues.  The Court is not making any determination about the
calculation of damages at this time.

[16]JFE cites to such documents as a February 19, 1992 "Repro Plant Safety Audit," which
indicates that ICIA discovered an "external leak," which was repaired the following day (D.I. 153

29

damages that resulted from a violation of an environmental law *or* damages resulting from the "use or generation" of "hazardous substances or toxic wastes" during the term of the TSA. In this regard, ICIA does not respond to the affidavit submitted by Charles Kibby, the Facilities Manager of the Santa Ana site since 1971. (D.I. 158 at C134-35) Mr. Kibby explained that during the term of the TSA, "rinse water, containing perchlorate, dripped off of the recycled Teflon materials and migrated into the soil and groundwater." (*Id.*)

Therefore, the Court will grant JFE's motion for summary judgment on Count VII. The Court will deny ICIA's motion for summary judgment on Count VII.

**c.   Count VIII: JFE breach of contract claim under the Framework Agreement**

Under the Framework Agreement, Defendant ICI "guarantee[d] the performance of ICIA," its subsidiary, of ICI's obligations under the APA and TSA. (D.I. 146 Ex. B at 8) The Court has concluded that JFE is entitled to summary judgment on Counts VI and VII, as there is no genuine issue of material fact that Defendants, ICIA and ICI, breached the APA and the TSA. It follows that there is also no genuine issue of material fact that, under the Framework Agreement, ICI must pay for ICIA's violation of the APA and the TSA. Accordingly, the Court will grant JFE's motion for summary judgment on Count VIII and deny Defendants' motion for summary judgment.

**C.   Remaining State Law Claims (Counts IX through XVII)**

All of Defendants' asserted grounds for seeking summary judgment on the remaining

---

at 19), as well as evidence that leaks of an acid mixture occurred on January 27, 1992 (D.I. 158 at C124). The Court cannot determine on the present record if ICIA's activities during the term of the TSA rise to the level of a violation of any environmental law.

state law (tort and California environmental statute) claims and the remaining federal declaratory judgment claims have already been addressed in connection with the other counts. For the same reasons given above, the Court will deny Defendants' motion for summary judgment on Counts IX through XVII.

## V.   **CONCLUSION**

For the foregoing reasons, the Court will deny Plaintiffs' motion for summary judgment on the CERCLA claims. (D.I. 139, Counts I-V) The Court will grant Plaintiffs' motion for summary judgment on the breach of contract claims. (D.I. 142) The Court will grant Defendants' motion for summary judgment on the CERCLA claims. (D.I. 140, Counts I-V). The Court will deny Defendants' motion for summary judgment on all other counts (Counts VI-XVII). An appropriate Order follows.